**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3269-21

TRIAD ADVISORS, LLC,
f/k/a TRIAD ADVISORS, INC.,

     Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE
DEVELOPMENT,

     Respondent-Respondent.

_____

Argued April 8, 2024 – Decided March 12, 2025

Before Judges Gilson, DeAlmeida, and Jacobs.

On appeal from the New Jersey Department of Labor and Workforce Development, Docket No. DOL 14-010.

John Steven Parker (Parker MacIntyre) of the Georgia and North Carolina bars, admitted pro hac vice, argued the cause for appellant (Louis H. Miron and John Steven Parker, attorneys; Louis H. Miron, on the briefs).

Kevin K.O. Sangster, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney

General, attorney; Donna Arons, Assistant Attorney General, of counsel; Kevin K.O. Sangster, on the brief).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Petitioner Triad Advisors, LLC, f/k/a Triad Advisors, Inc. (Triad), appeals from the May 31, 2022 final agency decision of respondent Department of Labor and Workforce Development (DOL) that eleven sales agents working in New Jersey were employees of Triad, and Triad is, therefore, responsible for paying unemployment and temporary disability contributions to the New Jersey unemployment compensation fund (the Fund) for those employees for the years 2008 through 2011. We affirm in part, reverse in part, and remand for further proceedings.

I.

Triad, based in Georgia, is an independent broker/dealer that sells mutual funds and other securities. Triad does not sell securities directly to the public. Rather, it operates through sales agents who, according to Triad, are independent contractors who are either self-employed or employed by a local entity unaffiliated with Triad.

The Gitterman firm (Gitterman) is a financial planning company in Iselin, New Jersey. In March 2010, Triad and Gitterman entered into an agreement that

Gitterman's employees who engaged in the sale of securities would become Triad's registered securities representatives (sales agents). The agreement provided that Gitterman would "serve as an OSJ [office of supervisory jurisdiction] of Triad." An OSJ is an office where a registered principle provides supervision to those engaged in the sale of securities. Each sales agent signed a separate agreement with Triad stating he or she was an independent contractor.

Under the agreement between Gitterman and Triad, Gitterman paid the salary and benefits of the sales agents and Triad paid commissions for the sale of securities directly to the sales agents. Gitterman made unemployment and temporary disability contributions to the Fund based on the salaries it paid the sales agents. Triad deducted a portion of the sales commissions otherwise due and paid the deducted portion to Gitterman as reimbursement for the overhead costs of the sales agents. In addition, through deductions from commissions, sales agents reimbursed Triad for insurance costs, licensing fees, and other costs. Triad issued 1099s to the sales agents in the amounts of the net commissions paid to them each year. Triad did not make unemployment and temporary disability contributions to the Fund on the commissions it paid the sales agents.

Sarah Shipman had been one of Triad's sales agents working at Gitterman. In 2010 and part of 2011, she earned salary and benefits from Gitterman and

3

commissions from Triad. On July 17, 2011, Shipman filed a New Jersey unemployment claim and named Gitterman and Triad as her employers.

On October 5, 2011, DOL issued a "notice of subjectivity" informing Triad it was a New Jersey employer liable for unemployment and temporary disability contributions to the Fund for Shipman, and additional sales agents who worked in New Jersey from 2008 to 2011, including fourteen sales agents who worked at Gitterman.[1]

On October 19, 2011, Triad appealed the notice to the DOL appeals tribunal, arguing its sales agents were exempt from unemployment and temporary disability contributions. Triad asserted two bases for an exemption. First, it argued the sales agents were exempt because they were securities salespersons not engaged in employment under the Federal Unemployment Tax Act (FUTA), 26 U.S.C. §§ 3301-3311. New Jersey recognizes an exemption for securities salespersons who qualify for an exemption under FUTA in certain circumstances. See N.J.S.A. 43:21-19(i)(7)(J) ("employment" for purposes of New Jersey unemployment tax does not include "[s]ervice performed by agents

---

[1] The audit included Triad sales agents who worked at firms other than Gitterman and prior to the 2010 contract between Triad and Gitterman. Triad's liability as to non-Gitterman sales agents is not an issue in this appeal. In 2017, Gitterman terminated its agreement with Triad and Gitterman's employees became associated with a different broker/dealer.

of mutual fund brokers or dealers in the sale of mutual funds or other securities . . . if the compensation to such agents for such services is wholly on a commission basis" and "[p]rovided that such services are also exempt under [FUTA] . . . .").

Second, Triad argued its sales agents were exempt under N.J.S.A. 43:21-19(i)(6)(A), (B), and (C), the statute that generally excludes from liability for unemployment and temporary disability contributions income earned by independent contractors.

Triad separately appealed its notice of liability with respect to Shipman.

In May 2012, Marliena Manocchio, a DOL investigator, began an investigation of the fourteen Triad sales agents other than Shipman employed by Gitterman. Triad submitted evidence to Manocchio in support of its claimed FUTA exemption and argued the sales agents were independent contractors under the Internal Revenue Service's (IRS) twenty-factor test set forth in Rev. Rul. 87-41, 1987-1 C.B. 296. The twenty-factor test is used by the IRS to decide whether workers are employees or independent contractors under FUTA.

Triad's counsel stated to Manocchio, "you have stated to me on numerous occasions that you will not consider Triad exempt [under] FUTA absent a specific Private Letter Ruling issued from the [IRS] to Triad." Triad disputed

Manocchio's reliance on N.J.A.C. 12:16-23.2(a) for insistence on a Private Letter Ruling, arguing that evidence the sales agents were independent contractors under the twenty-factor test was sufficient to establish an exemption under FUTA and, as a consequence, N.J.S.A. 43:21-19(i)(7)(J). In 2012, when Manocchio's investigation was ongoing, N.J.A.C. 12:16-23.2(a) provided:

> Evidence that services are not covered under FUTA may include among other things:
>
> 1.     Private letter ruling(s) from the [IRS];
>
> 2.     An employment tax audit conducted by the [IRS] after 1987 which determined that there was to be no assessment of employment taxes for the services in question; however, the determination must not have been the result of the application of Section 530 of the Revenue Act of 1978;
>
> 3.     Determination letter(s) from the [IRS]; or
>
> 4.     Documentation of response to the [twenty] tests required by the [IRS] to meet its criteria for independence. These tests are enumerated in IRS Revenue Rule 87-41.
>
> [50 N.J.R. 1027-28 (Mar. 19, 2018) (setting forth the text of N.J.A.C. 12:16-23.2(a) prior to a 2018 amendment of the regulation).]

Manocchio submitted an Auditor's/Investigator's report finding Triad did not establish an exemption under FUTA. She did not employ the IRS's twenty-factor test to determine if the sales agents qualified for a FUTA exemption.

Instead, Manocchio applied only the factors set forth in N.J.S.A. 43:21-19(i)(6)(A), (B), and (C) (the ABC Test). Manocchio found eleven Gitterman sales agents were employees of Triad and Triad was, therefore, liable for unemployment and temporary disability contributions to the Fund in the amount of $109,233.85.

Triad had three sales agents who worked at Gitterman and owned their own investment firms (Business Owners). Manocchio found the three Business Owners were independent contractors under the ABC Test and, therefore, Triad was not liable for contributions for those sales agents.

Separately, on May 8, 2013, appeals examiner Amit Mamroud, on behalf of the appeals tribunal, applied the IRS's twenty-factor test and determined Shipman was exempt under FUTA. DOL did not appeal that decision.

Notwithstanding the appeals tribunal finding regarding Shipman, Manocchio's determination as to the eleven sales agents who were not Business Owners was not reversed by the appeals tribunal.

In February 2014, David Menist, a DOL redetermination auditor, reviewed Manocchio's investigation and submitted a report. Menist concluded the eleven sales agents were Triad employees under the ABC Test. He did not consider the twenty-factor test or a FUTA exemption.

7

In September 2014, Triad requested a hearing before the Office of Administrative Law (OAL). On December 15, 2014, DOL transmitted the matter to OAL as a contested matter. DOL concedes the matter "got backlogged" because of internal issues at the agency and the hearing did not begin until three years later in December 2017.

An Administrative Law Judge held an evidentiary hearing on six dates between December 19, 2017, and June 28, 2018. Jeff Gitterman, the owner of Gitterman, testified it was necessary for the firm to associate with a broker/dealer for its employees to sell securities and for several years the firm worked with Triad. Jeff[2] testified he had complete control over the Triad sales agents' assignments, the amount of their commissions, and the portion of the commissions Triad remitted to him as reimbursements for expenses. According to Jeff, Triad had no control over where or when the sales agents worked, and the sales agents' only responsibility to Triad was to comply with applicable investor protection laws.

---

[2] We refer to Jeff Gitterman by his first name to avoid confusing him with the Gitterman firm. No disrespect is intended.

Triad did not hire the sales agents, but performed background checks on them, as required by Financial Industry Regulatory Authority (FINRA) rules.[3] Gitterman, not Triad, trained the sales agents. Triad required the sales agents to use specified computer and email systems that could monitor their email accounts, as required to comply with FINRA rules. Triad required each sales agent to carry insurance issued through Triad, and to pay Triad for the insurance coverage. Several sales agents and Business Owners testified at the hearing.

Christopher Pfeffer, a DOL redetermination auditor, testified for DOL. He stated there are three distinct tests used to determine whether a worker is an employee or an independent contractor for unemployment tax purposes: (1) the IRS's twenty-factor test, (2) the "common law" IRS test, which considers behavioral control, financial control, and the parties' relationship, and (3) the ABC Test. The IRS tests are used to determine employee status under FUTA.

Although neither Manocchio nor Menist used the twenty-factor test, Pfeffer used their research to apply the twenty-factor test to determine if the sales agents were exempt under FUTA. He found five of the factors weighed in

---

[3] FINRA is an organization of securities brokers and dealers subject to oversight by the Securities and Exchange Commission that has congressionally approved regulatory oversight authority of securities firms that do business with the public. Barr v. Bishop Rosen & Co., 442 N.J. Super. 599, 603 (App. Div. 2015); About FINRA, https://www.finra.org/about (last visited Mar. 5, 2025).

favor of the sales agents being independent contractors, and fifteen weighed in favor of a finding of employee status.  Pfeffer concluded, on balance, the sales agents were employees under the twenty-factor test.  Pfeffer made the same conclusion under the IRS common law test.  He stated Triad met all the requirements for a FUTA exclusion, except for proof of an IRS determination that a FUTA exemption had been met.

On cross-examination, Pfeffer conceded most forms of Triad's control over the sales agents were necessary for compliance with the Tax Relief Act of 1997 (TRA), Pub. L. 105-34, 111 Stat. 788 (codified at 26 U.S.C. § 3121), and FINRA rules.  The TRA provides:

> In determining for purposes of the Internal Revenue Code of 1986 whether a registered representative of a securities broker-dealer is an employee (as defined in section 3121(d) of the Internal Revenue Code of 1986), no weight shall be given to instructions from the service recipient which are imposed only in compliance with investor protection standards imposed by the Federal Government, any State government, or a governing body pursuant to a delegation by a Federal or State agency.
>
> [Pub. L. 105-34, 111 Stat. 788 (emphasis added).]

Pfeffer also considered each sales agent and Manocchio's finding under the ABC Test.  He agreed the sales agents were employees under that test.

The hearing ended on June 28, 2018. The record remained open for the filing of closing summation briefs and responses.

On September 18, 2018, DOL informed the ALJ of an amendment to N.J.A.C. 12:16-23.2(a) that became effective September 17, 2018. The rule amendment struck the fourth category of proof that could be submitted to establish workers were exempt under FUTA: "[d]ocumentation of response to the [twenty] tests required by the [IRS] to meet its criteria for independence. These tests are enumerated in IRS Revenue Rule 87-41." 50 N.J.R. 1027-28 (Mar. 19, 2018); 50 N.J.R. 2012(a), 2014 (Sept. 17, 2018). Thus, DOL would no longer permit use of the twenty-factor test to determine whether a worker was exempt under FUTA. After the amendment, to establish a FUTA exemption, DOL permitted proof only of an IRS private letter ruling; an IRS tax audit which determined that there was to be no assessment of employment taxes for the services in question; or an IRS determination letter, none of which Triad had, or likely would be able to obtain. N.J.A.C. 12:16-23.2(a)(1) to (3). DOL recommended that, under the time-of-decision rule, the ALJ decide Triad's appeal based on the newly amended regulation. The record closed approximately one year later, on September 24, 2019.

On October 13, 2021, more than two years after the record closed, the ALJ filed an initial decision.[4] The ALJ declined to apply the amended rule because it did not become effective until after the conclusion of the hearing. She did not set forth any analysis concerning that decision.

The ALJ analyzed each sales agent under the twenty-factor test to determine whether they satisfied the FUTA exemption and, therefore, qualified for the securities salesperson exclusion under N.J.S.A. 43:21-19(i)(7)(J). The ALJ also applied the IRS common law test, but mistakenly referred to it as the ABC Test. The ALJ concluded the factors overlapped for the three tests, and her conclusions were the same regardless of which of the tests was applied.

The ALJ found that under the twenty-factor test, fourteen factors pointed to independent contractor status for the sales agents: (1) instructions, finding the sales agents did not follow instructions from Triad on how to approach clients or make sales; (2) training, finding Triad provided no training to the sales agents; (3) integration, finding the sales agents were not involved in Triad's business of being a securities broker/dealer; (4) hiring, supervising, and paying assistants, finding Triad hired no assistants for the sales agents and any such

---

[4] The time for filing the initial decision was extended for medical reasons relating to the ALJ and because of the COVID-19 state of emergency.

assistance would have been provided by Gitterman; (5) set hours of work, finding Triad set no work hours for the sales agents; (6) full-time required, finding Triad did not require sales agents to work full-time; (7) working on employer's premises, finding the sales agents worked at Gitterman's place of business, but not at Triad's office in Georgia; (8) order or sequence set, finding the sales agents did not perform their work in any order or sequence set by Triad, and were required only to follow protocols set by investor-protection laws; (9) oral or written reports, finding the sales agents were not required to file reports with Triad; (10) payment by hour, week, or month, finding Triad paid the sales agents by commissions; (11) payment of business and/or travel expenses, finding Triad did not pay business or travel expenses of the sales agents; (12) furnishing tools and materials, finding Triad did not furnish the sales agents with tools or materials; (13) realization of profit or loss, finding the sales agents stood to profit from sales and risked loss if their commissions were insufficient to cover expenses; and (14) working for more than one firm at a time, finding the sales agents were required to work only for one broker by financial regulations.

The ALJ concluded six factors militated toward a conclusion the sales agents were employees: (1) services rendered personally; (2) continuing relationship, finding the sales agents maintained a continuing relationship with

13

Triad; (3) significant investment, finding the sales agents did not make a significant investment in Triad's business; (4) making services available to the general public; (5) right to discharge, finding Triad had the right to discharge the sales agents; and (6) right to terminate, finding the sales agents could terminate their relationship with Triad, but if they did so, they would not be able to sell securities at Gitterman.

The ALJ balanced these factors and found they militated in favor of a finding of independent contractor status for the sales agents. The ALJ reached the same conclusion under the IRS common law test. As a result, the ALJ reversed the determination that Triad was liable for contributions to the Fund for the eleven sales agents employed by Gitterman from 2008 to 2011.

DOL filed exceptions to the ALJ's initial decision.

On May 31, 2022, DOL Commissioner issued a final agency decision rejecting the ALJ's decision. The Commissioner determined that under the time-of-decision rule, the amended N.J.A.C. 12:16-23.2(a) would be applied to Triad's appeal because the amendment became effective one year prior to the close of the record and three years prior to the ALJ issuing her initial decision.

The Commissioner determined Triad could not establish the securities salesperson exclusion in N.J.S.A. 43:21-19(i)(7)(J) because it had failed to

establish a FUTA exemption using one of the three forms of IRS determination accepted under the amended regulation.

Thus, the Commissioner applied the ABC Test to determine if the sales agents were exempt as independent contractors. The Commissioner rejected the ALJ's findings under the ABC Test because she applied the IRS common law test, which is not applicable to a determination of employee status under N.J.S.A. 43:21-19(i)(1)(A).

Rather than remand the matter to the ALJ for consideration of the ABC Test, the Commissioner undertook an analysis of the record. In a comprehensive decision, the Commissioner found Triad failed to meet its burden under any of the prongs of the ABC Test. With respect to prong A, the Commissioner found Triad exercised control over the sales agents in multiple ways, including requiring approval of all advertisements, stationery, business cards, signage, and promotional materials. The Commissioner also found Triad reviewed all sales orders and required the sales agents to work at Gittleman, report customer complaints, and engage in no other business activity.

In addition, the Commissioner found Triad monitored the sales agents' emails, conducted background checks and fingerprinting of the sales agents, and required them to have insurance purchased directly from Triad. FINRA

15

regulations, while requiring insurance, do not require sales agents to buy that insurance directly from their broker/dealer. The Commissioner declined to follow Pub. L. 105-34, 111 Stat. 788, when interpreting New Jersey's statute.

With respect to prong B, the Commissioner found the services provided by the sales agents were within Triad's usual course of business of selling securities. In addition, the Commissioner found Gittleman's office, as Triad's OSJ, was a Triad place of business for the sale of securities.

With respect to prong C, the Commissioner found Triad had not established the sales agents were customarily engaged in a viable, independently established business. Instead, he found the only business activity they were permitted to do was to sell securities for Triad.

The Commissioner ordered Triad to remit all unpaid unemployment and temporary disability contributions for which it was assessed for the sales agents for the years 2008 to 2011, plus interest and penalties.

This appeal follows. Triad argues the Commissioner's retroactive application of the 2018 amendment to N.J.A.C. 12:16-23.2(a) was an error because: (1) the presumption of prospective application of a newly enacted provision was not overcome; (2) applying the amendment retroactively was

16

manifestly unjust; and (3) the weight of the equities favors Triad's argument that application of the prior version of the regulation was warranted.

Triad argues that under the prior version of N.J.A.C. 12:16-23.2(a), the ALJ correctly determined it established an exemption under FUTA under the twenty-factor test, which satisfies the exemption under N.J.S.A. 43:21-19(i)(7)(J). Triad argues we should affirm the ALJ's determination, even though the Commissioner did not consider the twenty-factor test. Finally, Triad argues the Commissioner's conclusion the sales agents are employees under the ABC Test is not supported by the record and should be reversed.

DOL opposes Triad's arguments. In addition, DOL argues that in the event we conclude the Commissioner should have made his decision under the prior regulation, the appropriate action would be a remand to permit the Commissioner to consider Triad's claims under the twenty-factor test.

II.

Our review of an administrative agency's final decision is limited. Kadonsky v. Lee, 452 N.J. Super. 198, 201-02 (App. Div. 2017) (citing In re Stallworth, 208 N.J. 182, 194 (2011)). "We will not reverse an agency's judgment unless we find the decision to be 'arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record

as a whole.'" Id. at 202 (quoting Stallworth, 208 N.J. at 194). We "defer to the specialized or technical expertise of the agency charged with administration of a regulatory system." K.K. v. Div. of Med. Assistance & Health Servs., 453 N.J. Super. 157, 160 (App. Div. 2018) (quoting In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008)). However, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973).

### A. The ABC Test.

We begin with the Commissioner's decision that the sales agents are Triad employees under the ABC Test. DOL administers the New Jersey Unemployment Compensation and Temporary Disability Insurance Laws (the "UCL"), N.J.S.A. 43:21-1 to -71. The "primary objective of the UCL is to provide a cushion for the workers of New Jersey 'against the shocks and rigors of unemployment.'" Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor, 125 N.J. 567, 581 (1991) (quoting Provident Inst. for Sav. in Jersey City v. Div. of Emp. Sec., 32 N.J. 585, 590 (1960)). DOL collects revenue to fund this benefits program through contributions made by New Jersey employers and employees. The employer and employee must contribute a specified percentage

of the employee's wages to the Fund.  N.J.S.A. 43:21-7.  A worker who is classified as an employee rather than as an independent contractor may collect unemployment benefits, if otherwise eligible and not otherwise disqualified. See generally N.J.S.A. 43:21-14 (eligibility conditions); N.J.S.A. 43:21-5 (disqualification criteria).  The UCL statute is remedial in nature and has been liberally construed to achieve its purposes.  Carpet Remnant, 125 N.J. at 581.

An important predicate for determining whether a business or worker is responsible for making payments into the Fund is whether there is a "statutory" employer-employee relationship between the workers and the business that engages them.  Ibid.  Such a statutory employer-employee relationship may exist even if the relationship does not satisfy common-law principles of employment. Ibid. (citing Gilchrist v. Div. of Emp. Sec., 48 N.J. Super. 147, 153 (App. Div. 1957)).

Under the UCL, "employment" consists of any service performed for remuneration or under any contract of hire, written or oral, express or implied. N.J.S.A. 43:21-19(i)(1)(A).  Once it has been established that a worker's service has been performed for remuneration, that service is deemed to be employment, unless the ABC Test establish non-employee status.  N.J.S.A. 43:21-19(i)(6).

The ABC Test prescribes that, for purposes of the UCL, an arrangement in which an individual performs services for remuneration is employment "unless and until" the following three requirements are proven:

> (A)   Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact;
>
> (B)   Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> (C)   Such individual is customarily engaged in an independently established trade, occupation, profession or business.
>
> [N.J.S.A. 43:21-19(i)(6)(A), (B), and (C).]

Under prong A, "[t]he person must establish not only that the employer has not exercised control in fact, but also that the employer has not reserved the right to control the individual's performance." Carpet Remnant, 125 N.J. at 582. "An employer need not control every facet of a person's responsibilities, however, for that person to be deemed an employee." Ibid. "[S]atisfaction of either of the B standard's alternatives is a prerequisite for avoiding designation as an employee." Id. at 584 (citing N.J.S.A. 43:21–19(i)(6)(B)). Prong C's requirement that a person be customarily engaged in an independently-

established business "calls for an enterprise that exists and can continue to exist independently of and apart from the particular service relationship. The enterprise must be one that is stable and lasting—one that will survive the termination of the relationship." Id. at 585 (quoting Gilchrist, 48 N.J. Super. at 158). "Thus, if the person providing services is dependent on the employer, and on termination of that relationship would join the ranks of the unemployed, the C standard is not satisfied." Id. at 585-86. "Conversely, the C standard is satisfied when a person has a business, trade, occupation, or profession that will clearly continue despite termination of the challenged relationship." Id. at 586.

The application of the ABC Test criteria is highly fact-sensitive. In Carpet Remnant, the Court reversed the Commissioner's finding of employee status concerning workers who performed carpet installations for the appellant company. Id. at 593. Disagreeing with the Commissioner's findings under prongs A and B, the Court held those workers were not employees because they were not, under prong A, subject to the control of the company who had hired them, and because, as to prong B, they had installed the carpeting at the locations of individual customers rather than at appellant's business office. Id. at 590-93.

The Court in Carpet Remnant cited with approval, see id. at 583-84, a then-recent opinion of this court in Trauma Nurses, Inc. v. Board of Review,

242 N.J. Super. 135 (App. Div. 1990), applying the ABC Test. We held in Trauma Nurses that nursing professionals who were placed by an employment broker with hospitals and other health-care facilities on a temporary basis were independent contractors and not the broker's employees. Among other things, with respect to prong A "the nurses were free to choose where and when to work, including working for other brokers or independently," "not obligated to comply with any rules, practices, or procedures set by [the broker]," that the broker "exercised no supervision over the nurses . . . [and] provided no training," "furnished no supplies, equipment, or uniforms," "did not provide any fringe benefits," and "the nurses were responsible for their own insurance coverage." Id. at 584 (citing Trauma Nurses, 242 N.J. Super. at 144–45).

We have reviewed the record and find no basis under our deferential standard of review on which to reverse the Commissioner's decision Triad did not establish the sales agents were independent contractors under the ABC Test. The Commissioner's findings under each prong of the test are supported by the evidence and comport with legal precedents interpreting the statutory test. As the Commissioner found, Triad controlled several aspects of the sales agents' work, the sales agents sold securities as part of Triad's ordinary business, and the sales agents did not engage in viable independent businesses apart from

22

selling Triad's securities. To the contrary, providing services to Triad was the only business activity they were permitted to pursue.

We disagree with Triad's argument that the Commissioner's decision was arbitrary and capricious because DOL determined the Business Owners were independent contractors while the sales agents, who worked under the same conditions as the Business Owners, were found to be employees. The finding that the Business Owners were independent contractors was made by an auditor on behalf of the appeals tribunal. DOL did not appeal that determination. Although the Business Owners testified at the hearing, the only issue before the ALJ, and the only issue addressed in her initial decision, was the employment status of the sales agents. Thus, the ALJ's initial decision concerned only the employment status of the sales agents. DOL's appeal from that decision, therefore, was also limited to the employment status of the sales agents.

Triad offers no legal authority for the proposition the Commissioner was bound to adopt the prior determination of the appeals tribunal auditor with respect to the employment status of the Business Owners and apply it to the sales agents. If, as Triad argues, the auditor's determination with respect to the Business Owners was conclusive as to the sales agents, there would have been no point in having a hearing, an initial decision, or an appeal to the

Commissioner. The different outcomes with respect to two sets of workers is the result of an administrative decision not to appeal an auditor's determination favorable to Triad at an early stage of DOL's consideration of the Triad's liability for contributions to the Fund for at least eleven other workers. DOL's decision not to appeal the determination of the Business Owners' employment status was not a concession that each of the other Triad sales agents were independent contractors. The different determinations are not indicative of an arbitrary and capricious determination the sales agents, based on the evidence adduced at the hearing, were employees under the ABC Test.

We have considered Triad's remaining argument with respect to the Commissioner's decision under the ABC Test and we affirm the portions of the May 31, 2022 decision concerning the ABC Test for the reasons stated by the Commissioner in his thorough and well-reasoned written decision. That, however, does not end our inquiry.

B.    The Securities Agents Exemption.

As discussed above, another way to establish an exclusion from the UCL is to establish an exemption under N.J.S.A. 43:21-19. One such exemption is the securities salesperson exclusion contained in N.J.S.A. 43:21-19(i)(7). The statute provides:

(7) Provided that such services are also exempt under [FUTA], as amended, or that contributions with respect to such services are not required to be paid into a state unemployment fund as a condition for a tax offset credit against the tax imposed by [FUTA], as amended, the term "employment" shall not include:

. . . .

(J) Service performed by agents of mutual fund brokers or dealers in the sale of mutual funds or other securities, by agents of insurance companies, exclusive of industrial insurance agents or by agents of investment companies, if the compensation to such agents for such services is wholly on a commission basis . . . .

[N.J.S.A. 43:21-19(i)(7).]

An element of proving an exemption under the securities salesperson exclusion is to establish an exemption under FUTA. Ibid. DOL promulgated regulations establishing how a business may demonstrate a FUTA exemption. N.J.A.C. 12:16-23.1 to -.2. As explained above, prior to the 2018 rule amendment, evidence of a FUTA exemption could be demonstrated by showing: (1) a private letter ruling from the IRS; (2) an employment tax audit conducted by the IRS which determined that there was to be no assessment of employment taxes for the services in question; (3) a determination letter from the IRS; or (4) evidence satisfying the twenty-factor test. N.J.A.C. 12:16-23.2(a)(1) to (4) (2017).

However, in 2018, DOL repealed subsection (a)(4) of N.J.A.C. 12:16-23.2. Thereafter, DOL no longer permitted evidence of the twenty-factor test. DOL stated the reason for the amendment was because it was "extremely difficult" to make rulings regarding the twenty-factor test without the benefit of an IRS ruling, 50 N.J.R. 1026(a), 1028 (Mar. 19, 2018), and because the IRS had discontinued use of the twenty-factor test in favor of the common law test, 50 N.J.R. 2012(a), 2014 (Sept. 17, 2018).

Triad argues the Commissioner erred by rejecting the ALJ's decision to use the prior version of the regulation and instead applying the amended regulation to decide the status of the sales agents. We agree.

Our Supreme Court addressed the time-of-decision rule, which is, in effect, a rule of retroactivity, in Kruvant v. Mayor and Council of Twp. of Cedar Grove, 82 N.J. 435 (1980). Although that opinion concerns application of the rule in the context of direct appellate review, the principles announced by the Court are salient here:

> It is a well-established principle that an appellate court on direct review will apply the statute in effect at the time of its decision, at least when the legislature intended that its modification be retroactive to pending cases. The purpose of the principle is to effectuate the current policy declared by the legislative body – a policy which presumably is in the public interest. By

applying the presently effective statute, a court does not undercut the legislative intent.

[Id. at 440.]

However, "[a]pplication of the time-of-decision rule . . . 'is not automatic'; a court must take into account equitable considerations, and the outcome depends upon a balance of the equities . . . ." Eastampton Ctr., LLC v. Plan. Bd. of Twp. of Eastampton, 354 N.J. Super. 171, 197 (App. Div. 2002) (quoting Pizzo Mantin Grp. v. Twp. of Randolph, 137 N.J. 216, 235 (1994)). "The ultimate objective is fairness . . . ." Tremarco Corp. v. Garzio, 32 N.J. 448, 457 (1960). Therefore, a balance "must be struck" between the interested parties. Ibid.

In balancing the equities, courts should consider the extent to which a party relied on the prior law. Ibid.; see also Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 387 (2016) ("[A]lthough everyone is presumed to know the law, no one is expected to anticipate a law that has yet to be enacted . . . ."); Cruz v. Central Jersey Landscaping, Inc., 195 N.J. 33, 45 (2008) (new laws should be prospective for reasons of fairness and due process); Gibbons v. Gibbons, 86 N.J. 515, 522 (1981) ("It is a fundamental principle of jurisprudence that retroactive application of new laws involves a high risk of being unfair."). In addition, administrative rules are generally given prospective effect.

Metromedia, Inc. v. Dir., Div. of Tax'n, 97 N.J. 313, 329-34 (1984); accord In re Appeal of Adoption of N.J.A.C. 7:7A-1.4, 118 N.J. 552, 552-54 (1990) (citing In re Appeal of Adoption of N.J.A.C. 7:7A-1.4, 240 N.J. Super. 224, 234-42 (App. Div. 1989) (Skillman, J.A.D., dissenting) (noting that administrative regulations are ordinarily construed to be solely prospective in operation)).

In Urban Farms, Inc. v. Borough of Franklin Lakes, 179 N.J. Super. 203, 221-22 (App. Div. 1981), we explained, when considering whether to retroactively apply a zoning amendment:

> [W]e are of the view that its applicability requires a weighing of such factors as the nature, extent and degree of the public interest to be served by the ordinance amendment on the one hand and, on the other hand, the nature, extent and degree of the developer's reliance on the state of the ordinance under which he has proceeded, [and] the extent to which his undertaking has been at any point approved or encouraged by official municipal action . . . .

Retroactive application of a change in law is appropriate where the body that adopted the change intended retroactivity, when the change in the law is "ameliorative or curative," or when the parties' expectations warrant retroactive application. State v. J.V., 242 N.J. 432, 444 (2020) (citing Gibbons, 86 N.J. at 522-23).

A-3269-21

Triad argues DOL intended the amendment to N.J.A.C. 12:16-23.2(a) to have prospective application only because the adoption of the amendment stated DOL would no longer be conducting an analysis under the twenty-factor test, suggesting future application only. See 50 N.J.R. 2012(a). Also, Triad notes DOL adopted the rule amendment on July 27, 2018, to become effective September 18, 2018. Courts have recognized that a delayed effective date is indicative of an intent that a change in law have prospective effect only. Twiss v. State, Dept. of Treasury, 124 N.J. 461, 468 (1991); Sarasota-Coolidge Equities II, L.L.C. v. S. Rotondi & Sons, Inc., 339 N.J. Super. 105, 116 (App. Div. 2001).

Triad argues the amendment was not intended to be curative, further militating against retroactive application. According to Triad, the twenty-factor test had been successfully used by DOL for decades to determine whether a FUTA exemption was established. Nothing in the record suggests application of the prior regulation resulted in unduly harsh or unjust outcomes. See People v. Oliver, 134 N.E.2d 197 (N.Y. 1956), cited with approval in In re Smigelski, 30 N.J. 513, 527 (1959). DOL responds that the amendment was ameliorative because it had become difficult, if not untenable, to ascertain whether the twenty-factor test applied without the benefit of an IRS ruling.

A-3269-21

Finally, Triad argues the parties did not expect retroactive application of the rule amendment. During the years at issue, 2008 to 2011, the prior regulation was in effect and DOL offered no evidence that a change in the regulation was expected. In fact, as late as 2018, during Triad's hearing, Pfeffer applied the twenty-factor analysis to the sales agents. Moreover, even though the amendment was first proposed in March 2018, and adopted in July 2018, DOL did not argue during the portions of the hearing that took place after March 2018 that the twenty-factor analysis should not be applied to the sales agents.

Triad also argues it would be manifestly unjust to apply the amendment retroactively. The manifest injustice doctrine was examined by our Supreme Court in Oberhand v. Dir., Div. of Tax'n, 193 N.J. 558 (2008). Although the Court did not issue a majority opinion, three Justices held the doctrine allows a court to bar retroactive application of a statute as an equitable remedy "to prevent unfair results that do not necessarily violate any constitutional provision." Oberhand, 193 N.J. at 572 (quoting State Troopers Fraternal Ass'n v. State, 149 N.J. 38, 54 (1997)). A fourth Justice issued a concurring opinion stating that the doctrine allows a judicial remedy where retroactive application of a statute would violate the constitutional right to fundamental fairness and due process of law. Id. at 575 (Albin, J., concurring).

> Although no opinion in <u>Oberhand</u> was joined by four Justices, a majority of the Court held that the retroactive application of a . . . statute can be precluded by judicial action in circumstances where the retroactive [application] is manifestly unjust – whether under a common law notion of fairness or as a matter of State Constitutional principle.
>
> [<u>Leger v. Dir., Div. of Taxation</u>, 29 N.J. Tax 354, 366 (Tax 2016).]

Before giving relief under the doctrine, a court must "weigh[] the competing factors of the public interest in the retroactive application of the amended statute, the affected parties' reliance on the previous law, and the consequences of that reliance." <u>Id.</u> at 365. The court may block retroactive application of a statute if doing so would be "harsh and unfair . . . ." <u>Oberhand</u>, 193 N.J. at 574.

Triad argues it relied on the prior regulation from 2008 to 2011 when it did not make contributions to the Fund on commissions it paid to the sales agents, and it would be unfair to preclude it from using evidence available under the prior regulation to prove a FUTA exemption for those workers. In addition, Triad argues that at the point the Commissioner decided to apply the amended rule retroactively, it was far too late for Triad to procure one of the remaining acceptable forms of proof from the IRS. For example, section 6.12 of <u>Internal Revenue Bulletin</u> No. 2022-1 states the IRS will only issue documentation attesting to exempt status for a current employee. Most sales agents were no

longer employees of Triad by the time of the hearing, let alone at time of the Commissioner's decision ten years after the close of the audit period.

The record also establishes the extensive period of time it took for DOL to resolve this matter. Triad requested the hearing in September 2014, but it did not begin until December 2017, due to internal matters at DOL. During that more than three-year period, the prior regulation was in place and would have been applied to any decision by DOL.

The hearing did not conclude until June of 2018. While the hearing was ongoing, DOL proposed the amendment in March 2018. Yet, DOL did not notify Triad or the ALJ of the amendment proposal or inform them of DOL's position that if the amendment was adopted and became effective prior to issuance of ALJ's decision, the agency would argue the ALJ was precluded from applying the twenty-factor test.

When the hearing ended in June 2018, the proposed amendment had not yet been adopted. Again, DOL did not inform Triad or the ALJ of its intention to assert the time-of-decision rule once the amended rule, if adopted, became effective. It was not until September 19, 2018, three months after the hearing ended, and one day after the amendment was adopted, that DOL informed Triad and the ALJ of the amendment and its reliance on the time-of-decision rule.

32

We agree with both grounds on which Triad argues the Commissioner's retroactive application of the amendment was an error. On its face, the amendment makes no indication it is intended to be applied retroactively. To the contrary, it took effect sixty days after adoption. In addition, in its explanation for adopting the amendment, DOL stated would "no longer" find a FUTA exemption without one of the three accepted forms of an IRS determination of exemption. This statement suggests prospective application of the amendment. Nor does the record support a claim the amendment is curative. At adoption of the amendment, DOL stated the regulation was revised to address the administrative inconvenience of deciding whether a federal statutory exemption has been satisfied without a determination from the IRS. The record contains no evidence of unjust or oppressive outcomes under the prior version of the rule.

The equities also favor prospective application of the amended regulation. Triad demonstrated its reasonable reliance on the prior version of the regulation during the time it was paying commissions to the sales agents, but not making contributions to the Fund for their services. During that time, Triad relied on its ability, if challenged by DOL, to produce evidence that would establish a FUTA exemption without having to obtain a determination from the IRS. At no time

during the pendency of Triad's appeal did the agency indicate it intended to amend the regulation and rely on the time-of-decision rule to preclude consideration of the evidence Triad had proffered during the hearing to establish the FUTA exemption. Although it had proposed the amendment while Triad's hearing was ongoing, DOL did not notify Triad of the proposal and the agency's position that the amended regulation, if adopted, would control the outcome of Triad's appeal. DOL revealed its reliance on the time-of-decision rule one day after the amended regulation became effective, which was months after Triad's hearing had ended. Importantly, at that time, Triad likely was unable to obtain from the IRS a determination it previously did not need to establish the exemption.

We also conclude it would be unjust to apply the amended regulation in this instance. The three-year delay, from December 2014 to December 2017, in scheduling a hearing after transmission of this matter to the OAL is attributable to the agency. From the time the hearing ultimately began in December 2017, until the record was closed in September 2019, less than two years passed. It is reasonable to assume that had DOL started Triad's hearing in a timelier fashion, the record would have been closed before the amended regulation took effect in September 2018.

Triad had only two statutory avenues to establish an exemption. After a multi-year delay caused by DOL, the Commissioner precluded Triad from pursuing one of those avenues by applying an amended regulation that was adopted and took effect shortly after Triad's long-delayed hearings ended. Retroactive application of the amended regulation was, in these circumstances, unjust. Triad's claimed exemption must be determined under N.J.A.C. 12:16-23.2(a), as it existed prior to the September 2018 amendment.

C.    Need for remand.

Triad argues that although the Commissioner did not apply the twenty-factor test, we should, in effect, affirm the ALJ's conclusion that Triad established the sales agents were exempt under FUTA and, therefore, N.J.S.A. 43:21-19(i)(7)(J). However, given the Commissioner's statutory authority to make final determinations on behalf of DOL, we agree with DOL's argument that the appropriate action is to remand to the agency so the Commissioner can analyze Triad's claim to a FUTA exemption under N.J.A.C. 12:16-23.2(a), as it existed prior to the September 2018 amendment.

We note the Commissioner's determination that the sales agents were employees under the ABC Test does not preclude Triad from establishing the sales agents' service is not "employment" under the exception in N.J.S.A. 43:21-

19(i)(7)(J).  See Carpet Remnant, 125 N.J. at 581-82 (holding that the ABC Test becomes applicable only after a worker is found have engaged in employment not subject to a statutory exemption).

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3269-21